Johnny BROWN, Jr., etc., et al., Plaintiffs-Appellees-Cross Appellants,

v.

DADE CHRISTIAN SCHOOLS, INC., etc., et al., Defendants-Appellants-Cross Appellees.

No. 75–3260.

United States Court of Appeals, Fifth Circuit.

July 25, 1977.

Rehearing Denied Sept. 12, 1977.

Lawrence R. Metsch, Miami, Fla., for defendants-appellants-cross appellees.

Ellis S. Rubin, Miami, Fla., for plaintiffs-appellees-cross appellants.

Before BROWN, Chief Judge, GEWIN, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE, TJOFLAT, and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Appellant-defendant Dade Christian Schools, Inc. (Dade Christian) appeals from the judgment of the District Court for the Southern District of Florida awarding damages to plaintiffs and enjoining defendant school from barring Valerie and Jacquelin Brown from enrolling in the school because of their race.

The plaintiffs in this case, Mr. and Mrs. Johnny Brown, Jr. and their two children, named above, are members of the black race. The defendant, Dade Christian, is a sectarian school, located on the property of and receiving subsidies from the New Testament Baptist Church. Its students are not limited to those in families of church members and it advertises in the "yellow pages" section of the telephone directory.

On July 25, 1973, Mrs. Brown with her children applied to Dade Christian for enrollment of her children. Upon arrival, Mrs. Brown was handed a printed card reading:

> "DADE CHRISTIAN SCHOOLS
> 6601 N.W. 167th Street
> Hialeah, Florida 33015
>
> *We are sorry . . . But the policy*
> *of the school is one of non-integration*
> *and we would request that you respect this policy.*
>
> School Administration"

Mrs. Brown and her children left the premises, allegedly embarrassed and humiliated, and this suit followed.

It is stipulated that race was the sole reason for the refusal of appellant to enroll the Brown children.

A nonjury trial was conducted and evidence taken consisting of depositions and documents. The first issue was whether or not 42 U.S.C.A. § 1981[1] applied to discrimination by a private school. If it were found that 42 U.S.C.A. § 1981 did apply the court was confronted with the question as to whether or not the conduct of the defendant constituted the exercise of religious belief protected by the Free Exercise of Religion Clause.[2] The defendant asserted that its members sincerely held a religious belief that socialization of the races would lead to racial intermarriage, and that this belief, sanctioned by the Free Exercise Clause, should prevail against private interests created by Congress.

The trial judge held that Section 1981 reached and forbade private discriminatory conduct of the school. The trial court then conducted a full trial and, based upon evidence received, found as a fact that defendant's discriminatory policy was based upon a social policy or philosophy and was not a part of the exercise of religion. Therefore, any question of balancing interests embod-

1. 42 U.S.C.A. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

2. U.S.Const. Amend. I provides in part:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .

ied in § 1981 with those expressed in the Free Exercise Clause was not reached.

Judgment was entered for the plaintiffs. Dade Christian appeals, contending that Section 1981 does not reach private discrimination and, further that the findings of fact by the District Court were clearly erroneous.

When this appeal came to us, the Supreme Court had before it for decision the issue of the applicability of Section 1981 to private schools. We ordered that this case be heard *en banc* rather than by a panel of this Court.

On June 25, 1976, the Supreme Court in the case of *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415, held that 42 U.S.C.A. 1981, like 42 U.S.C.A. § 1982, reaches private conduct and prohibits private, commercially operated, non-sectarian schools from denying admission to prospective students because they are black. Therefore, while this issue was raised in the appeal it is no longer an issue for us to decide. Judge Eaton's decision on it preceded the *Runyon* case. He resolved it correctly. *Runyon v. McCrary, supra.*

The Supreme Court noted that the *Runyon* case did not call for the resolution of any potential tension between litigants seeking to enforce Congressionally created civil rights and those relying on the Free Exercise of Religion Clause of the First Amendment of the Constitution.[3]

■ Although the defendant would have us resolve this issue left open in *Runyon,* we are, also, not called upon to balance these potentially conflicting interests. The trial judge, after careful consideration of all the evidence, concluded that the defendant's policy of segregation was not the exercise of religion. Our review of the evidence convinces us that the findings of the trial judge were supported by substantial evidence. The printed card handed to Mrs. Brown at the school expressly stated the racial exclusion to be based on policy. The application for admission to the school contains a list of nine tenets entitled "[w]e believe." While these tenets may constitute religious beliefs, none of them includes anything relating to segregation of schools. Indeed, they do not refer to commingling or separation of the races at all.

■ We do not hold that a belief must be permanently recorded in written form to be religious in nature. However, the absence of references to school segregation in written literature stating the church's beliefs, distributed to members of the church and the public by leaders of the church and administrators of the school, is strong evidence that school segregation is not the exercise of religion.

Five days prior to the filing of this suit, the minutes of the church disclosed the following:

> Dr. Janey explained to the congregation the decisions that had been made by the church in previous years in regard to integration. He also explained that he would follow the previous dictates of the church in this area *unless instructed otherwise by the membership.* (emphasis added).

We agree with the trial judge that the indication that the contested belief would be subject to change upon the direction of the congregation comports with the social or political nature of the exclusionary policy.[4]

The principal of the school, Mr. Kreft, was asked for the basis for forbidding commingling of whites and blacks. He answer-

---

**3.** "It is worth noting at the outset some of the questions that these cases do not present. . . They do not even present the application of § 1981 to private sectarian schools that practice racial exclusion on religious grounds." 427 U.S. at 167, 96 S.Ct. at 2592.

**4.** As pointed out in the dissenting opinion of Judge Roney, the trial court could have found this the exercise of religion by a congregation-

ally organized church wherein every believer is his own priest. This is to say, the finder of fact in this case might have, from the evidence, found the facts to be different from the resolution actually reached. But he did not, and it was his duty to weigh the evidence. Ours is to determine whether or not there was sufficient evidence upon which to base the finding. F.R.Civ.P. Rule 52, 28 U.S.C.A.

ed, "Just by general references. Now, I don't know of a specific position, other than policy directives."

Mr. Kalapp, an incorporating officer, of defendant school, when asked how the policy of exclusion was adopted, responded as follows: "I don't think it was adopted at a specific time as I recall it. I think it was something that evolved as a philosophy and a policy over a period of a number of meetings."

Mr. Kreft further stated that "[b]asically it would be more or less the Board of Directors of the School who would direct me regarding the policy of enrollment."

Mr. Ackerman, held the position of secretary-treasurer for the first five years of the school's existence, 1961–66. He stated that, at the time he left the school, he was not aware of any policy concerning the enrollment of blacks and the reason for this was because "[t]he issues in the first five years were not very strong issues in those days, because even in our public schools, the integration was just very token, and just beginning at that time."

To the same effect is the statement of Mr. Kalapp that the policy "came into being on a very gradual basis, because in the very early days of the school there was no such conversation in regard to integration." Later, in his words, the leaders "decided that a school philosophy needed to be adopted in view of the fact that it had gotten to be such a topic of conversation, . . . because of all the furor in the newspapers and other news media that was being brought about by such things as busing and forced integration in schools."

From the above, and other evidence, the trial judge concluded that, if belief in school segregation was religious in nature, neither the officers of the school nor the congregation of the church were aware of it. He found that as social conditions changed and the issue arose, a policy was formulated by the school leaders. While a religious belief may be of recent vintage or formed instantaneously, the trial judge's conclusion that school segregation was nothing more than a recent policy developed in response to the growing issue of segregation and integration was amply supported by the evidence.

▮ Though difficult, it is clearly the duty of the court to decide, as a matter of fact, whether or not any activity constitutes the exercise of religion. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1971); *Theriault v. Carlson,* 495 F.2d 390 (5th Cir. 1974); *Founding Church of Scientology v. United States,* 133 U.S.App. D.C. 229, 409 F.2d 1146 (1969); *United States v. Kuch,* 288 F.Supp. 439 (D.C.D.C. 1968).

▮ Judge Goldberg's special concurrence misses the mark in two ways. First, he assumes that the institutional actors, i. e., the school and the church, do not have independent rights of free exercise of religion which they can assert. The existence or non-existence of institutional rights of free exercise is a perplexing legal question which we need not decide here. Second, and more important, cases such as *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Gillette v. U. S.,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) do not apply to the case at bar. *Gillette* and *Yoder* dealt with the actions of individuals; in *Gillette* a willful failure to report for induction into the armed forces, and in *Yoder* violation of the compulsory school attendance law. Therefore, it was appropriate to scrutinize the individual religious beliefs of the parties in those cases. Here, however, the refusal by Dade Christian School to admit a black child was an institutional action taken by an institution whose patrons are, according to the evidence, divided in their beliefs on the religious justification for racial segregation. In such a situation the only practical course open to a Court is to examine the corporate beliefs of the institution involved, as adopted or promulgated or carried forward as an institutional concept. To do otherwise would allow the institution to pick and choose which of its members' potentially conflicting beliefs it wished to assert at any given time. Thus, an avowedly secular school should not be permitted to interpose a free exercise

defense to a § 1981 action merely because it can find some of its patrons who have a sincere religiously based belief in racial segregation. Conversely, a school or church which holds racial segregation as a religious tenet should not be barred from asserting a free exercise defense to a § 1981 claim merely because some of its patrons or members might individually believe racial segregation is morally wrong.

Our opinion today is not to be taken as requiring or suggesting that religious beliefs be institutionalized in order to be eligible for First Amendment protection. Indeed, they need not be. Yet, congregational churches recognizing no dogma other than the priesthood of the individual do institutionalize many activities sponsored or supported by them. Scout troups, hospitals, colleges and universities are but a few. When the lawfulness of an activity of any such institution is in question, the focus of the inquiry must be upon the basis for the institution's activity. Whether it be the troop's policy for the award of merit badges, the hospital's requirements for staff privileges, or the college's admission principles, the basis is that particular *institution's* basis. Whether or not it is the exercise of religion or simply a policy of the institution not presenting constitutional issues is a question of fact. We affirm the district court's finding on that question. Judge Goldberg and Judge Roney call attention to some evidence upon which a contrary finding might be made, but its focus is more upon individuals than upon the school, itself, and it is only the admission policy of the school under scrutiny.

It is for this reason that the district judge sought to determine whether or not the sincerely held beliefs of some of the members of the church had been institutionalized as a religious exercise by the school. He found that this private school wished to deny admission to blacks for the same reasons as Bobbe's Private School and Fairfax-Brewster School, Inc. had, and not as the exercise of religion. *Runyon* declares that this cannot be done.

Judge Goldberg refers to the whims of fact-finders. We do not characterize findings of fact in our judicial system as whimsical. No oracle has been identified to which difficult issues may be referred, and we find none. Therefore, we have addressed the issue presented in this case and we affirm the trial court's resolution.

AFFIRMED.

JOHN R. BROWN, Chief Judge, concurring:

I concur in that portion of part V of Judge Goldberg's opinion articulating the principles of balancing and the conclusion that governmental interest in desegregation of schools outweighs the First Amendment claim, if any, of the school, the church, or both.

GOLDBERG, Circuit Judge, specially concurring:

Today the plurality embraces the unacceptable principle that beliefs derived from the Bible by members of a Florida Baptist church do not constitute "religion" within the meaning of the first amendment. Its constrictive definition of religion. is an egregious departure from the fundamental precept of unswerving religious tolerance that underlies the Constitution's religion clauses. I must respectfully but emphatically record my disagreement with the plurality's approach. This record discloses views that are "religious."

While I agree with the dissenters that appellant raises a free exercise claim that must be considered on its merits, I believe we cannot legitimately delay that consideration, and I therefore reject their suggestion of a remand. I concur in the plurality's result because I believe that appellant's free exercise claim is outweighed by the compelling governmental interest in securing the rights of blacks freely to contract with private schools, thus eradicating one of the badges of slavery against which this nation and this court are firmly committed.

In sum, the record is clear that the relevant beliefs are religious but equally clear that the religious practices are destructive

of the undergirding principles of the thirteenth amendment. Appellant has not established a successful defense to appellees' § 1981 action. The plurality reaches a righteous result for errant reasons.

I write extensively because of two intense convictions. First, religious concepts, even when imperfectly expressed, should not be denigrated into non-religion. Second, the rights of blacks to participate in our society on equal terms must have ascendancy over a religious practice that can be subordinated without impairing the religion's viability.

## I.

Much of the difficulty with the plurality's approach stems from its handling of the district court opinion. The plurality begins and ends its inquiry with the conclusion that there is substantial evidence to support the district court's characterization of the beliefs in question as merely "philosophical" rather than "religious."

I believe the plurality's reliance on the trial court is erroneous. First, the district court improperly framed the issues, and its analysis suffered accordingly. Second, there is in any event no justification for the plurality's total deference to the trial court on this important issue.

1. The Supreme Court so held in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976):

   It is clear that the schools have standing to assert these arguments on behalf of their patrons. See *Pierce v. Society of Sisters*, 268 U.S. 510, 535–536.

   *Id.*, 427 U.S. at 175 n. 13, 96 S.Ct. at 2596. The Court's disposition of the issue in a single footnoted sentence is understandable; the proposition was too well settled for controversy. *Pierce* was but one of many cases the Court could have cited. *See generally* Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L. Rev. 423 (1974) (collecting cases; suggesting analysis fully consistent with finding standing here). *Cf. Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977) (saloon proprietor can assert constitutional rights of patrons).

## A.

The first task in analyzing the free exercise defense is to determine whose "religion" is at stake. The problem arises because appellant is a corporation, Dade Christian Schools, Inc. (hereinafter Dade Christian). Properly analyzed, the issue is one of standing to assert the constitutional rights of others. Under the circumstances here Dade Christian undeniably has standing to assert the constitutional rights of its students and their parents.[1] Similarly, Dade Christian has standing to assert the rights of its teachers and of members of the New Testament Baptist Church. That church founded Dade Christian and establishes its policies, and Dade Christian Conducts its classes on the church's property.

I would have thought that no member of this court would disagree with these conclusions with respect to standing. In analyzing standing we must assume that these various third parties have a free exercise right to attend or maintain a segregated school. The question is whether, assuming there is such a right, Dade Christian can assert it. The answer is clear. If Dade Christian is denied standing to assert the free exercise rights of its students and the church's members, those rights will be forever lost. The injury this damages action will impose on the school will operate as a denial of those third parties' rights. The rights of students and church members will be of little value if the school itself must integrate.[2]

The rights asserted in *Runyon* were associational rights, whereas Dade Christian seeks to assert its patrons' religious rights. The difference, however, is irrelevant to the standing issue.

2. The plurality's assertion that we should focus solely on the institution is no more appropriate here than in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). *See* note 1 *supra*. The *Runyon* court required no showing of whether the students and parents universally ascribed to the views espoused, and we should follow that lead. If some students disagree with the rights that the school espouses on behalf of others, the balance of substantive interests might be affected, but the right ever to litigate the interests should not be foreclosed. Moreover, this record demonstrates no disagreement at all. Some individuals may articulate the moorings of their beliefs in different

The problem, then, is to determine the relevant religious beliefs [3] of the students, their parents, the teachers, or the church members. The district court, however, approached the issue in a much different fashion. Unguided by the parties, the court sought to determine the religious beliefs of the *institutions*—the school and the church—rather than of the *people* behind the institutions. Framed in that manner, the issue is unduly difficult. The district court's response was destined to fail because of the improper framing of the issue. The court held that the *institution's* religious beliefs should be taken to be a subset of the religious beliefs of any given church member: the *institution's* beliefs were only those beliefs that could be characterized as "generally held, recognized, [and] fundamental." More fully, the district court said:

> We are here concerned with whether or not the leadership in the school, or the school itself, excluded [appellee children] because of a generally held religious conviction, a generally held tenet of religion. In other words, we are not talking about whether one individual out there operating the school may have had some particular fundamental belief, or one person in the church had a particular fundamental religious belief, but whether there was a generally held, recognized, fundamental

religious tenet of the school through its leadership.

Perhaps if we were truly concerned only with the religious views of a corporation itself, the district court's approach would have merit. But our concern is not so limited. We are concerned with the individual religious beliefs of school students and church members. To hold otherwise would be to deny the school's standing to assert the students' and church members' constitutional rights and to foreclose those rights from ever being aired.[4]

### B.

Even had the district court framed the issue properly, the plurality's reliance on its views would be improper. Whether particular beliefs constitute "religion" is not simply a question of fact. The inquiry is a mixed question, a question of the application of law to facts. Our responsibility to exercise our own independent judgment on the issue is therefore much greater than the plurality acknowledges.

The plurality's departure from the proper review standard is particularly troublesome under the circumstances here. First, this is a first amendment case, and our jurisprudence has long recognized the freedom of appellate courts to reassess the facts in such cases.[5] Our precious first amendment liber-

ways, but so far as this record is concerned, not a single Dade Christian student, parent, teacher or administrator opposes racial segregation. An institution willing to conduct a segregated school, thus accommodating the individual religious beliefs of its patrons, should be allowed to assert their rights.

3. No one has attempted to distinguish "practices" from "beliefs," and I use the terms without attributing a significance to the distinction. Religious *beliefs* enjoy absolute constitutional protection; appellees presumably do not question New Testament Church members' right to entertain any beliefs they choose. What is at issue is the religious *practice* of maintaining racial segregation in certain activities.

4. Contrary to the plurality's suggestion, I do not take the position here that an institution has no free exercise rights of its own. I agree with the plurality, although for different reasons, that "[t]he existence or non-existence of institutional rights of free exercise is a perplex-

ing legal question which we need not decide here." *Ante* at 313. The individual rights are sufficient to take us to the merits, eliminating any necessity to rely on institutional views.

5. *See, e. g., Cox v. Louisiana*, 379 U.S. 536, 545 & n. 8, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) the Court reviewed the criminal convictions of parents who for religious reasons refused to send their children to public schools beyond the eighth grade. The Supreme Court made no effort to stay close to the findings of the trial court, nor did it invoke the familiar principle that after criminal convictions facts are reviewed in the light most favorable to the government. Instead, the Court's opinion contains numerous recitations of evidence apparently unsupported by findings of fact, and the Court freely cited sources not contained in the record at all. *See* 406 U.S. at 210 n.5, 216 n.7, 217 n.8, 223 n.12, 92 S.Ct. 1526.

ties have never been entrusted solely to the whim of some trier of facts. Indeed, the plurality opinion illustrates precisely how an ostensible "finding of fact" may mask a series of value-laden assumptions in this difficult area. When "findings of fact" carry such grave implications, review should never be cursory. All levels of the judicial force have an obligation to maintain an unrelenting vigil over first amendment freedoms.

Moreover, in this case there is no justification whatsoever for reliance on the district court's factfinding. The district court heard not a single live witness. The parties submitted the case on the basis of depositions and exhibits only. We have available to us all the sources from which the district court drew its conclusions, and we see them in the same form as did the trial judge. The record consists of a single volume, assorted documents and a cassette recording; reaching our own conclusion with respect to whether these beliefs constitute "religion" does not impose a significant burden on appellate resources. To defer to the district court rather than undertake a de novo determination of this important issue is to abdicate our solemn responsibility to reject claims of constitutional right only after careful reflection. I believe we should ourselves assess the record to determine whether the beliefs in question are "religious."

## II.

Before undertaking a review of the record, I deem it appropriate to say a word about the nature of the inquiry. Judge Roney, in his dissent, has amply demonstrated the plurality's departure from sound first amendment jurisprudence. The plurality focuses on a preliminary inquiry into whether beliefs comport with a niggardly definition of "religious." We should instead define "religion" broadly and redirect our attention to the merits of the free exercise claim. One person's heresy can be another's religion. It is extremely important that religion be defined in such a manner that labeling does not become the touch-

stone of constitutional analysis. We must be clear beyond the peradventure of anyone's speculation that what is religion is given its place as religion. Relying upon Judge Roney's marshaling of the authorities for these propositions, I add a brief word to emphasize my view of their importance and to set out my understanding of today's holding.

History records abundant instances of religious persecution. Although some have been directed at established religions, probably most have impinged upon religious heretics who were, at least initially, without an organized following and without an institutionalized catalog of their beliefs. Religious heterodoxy often becomes orthodoxy, but the transformation need not be instantaneous. Well-charted dogmas and creeds are not necessary to a new or even to an old religion. The plurality's focus on the lack of such attributes raises the possibility that first amendment protection would be withheld from those who need it most. Indeed, it is at least unclear whether the plurality would accord first amendment protection to a modern Martin Luther or Roger Williams. The framers of the Bill of Rights would undoubtedly be dismayed to learn the restricted scope today suggested for the religion clauses. I cannot emphasize too strongly how grievously I believe the plurality errs by unconsciously importing into its test for defining "religion" its own views about how a church should be organized, how it should express its views, and how an individual should manifest his or her religious beliefs.

It is important to note that a majority of this court today rejects these erroneous views. That majority is comprised of the seven judges whose views are expressed in Judge Roney's opinion or in this opinion. For the most part I agree with Judge Roney, though even he adopts a requirement that a belief must have "an institutional quality about it" in order to bring the religion clauses into play. Because in another part of his opinion Judge Roney makes clear his understanding—with which I fully concur—that discriminating among reli-

gions on the basis of their manner of deriving or expressing their views is unconstitutional, I believe Judge Roney's "institutional quality" remark should be given an extremely broad reading. At any rate, while I cannot at this juncture join his precise framing of the test, it is at least clear that today a majority of this court squarely rejects the plurality's narrow and unprecedented approach to defining "religion." Whatever the outer perimeters of the concept of "religion," the beliefs at issue here do not exceed them.

This view is confirmed by *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). There the Court entertained a free exercise claim derived from a "personal decision" "based on a humanist approach to religion." *Id.* at 439, 91 S.Ct. at 831. There was no showing that Gillette's religion had any other adherents or exhibited any "institutional quality" other than its role in Gillette's life. The Court held that legitimate governmental interests justified drafting Gillette despite his religious opposition to the Vietnam War. The Court considered the free exercise claim on its merits rather than rejecting it as not "religious." *Id.* at 461–62, 91 S.Ct. 828. By doing so the Court conclusively demonstrated the error of the plurality's approach[6] and the necessity to read Judge Roney's "institutional quality" remark broadly.[7]

Religions can have abhorrent principles; most religious practices are benign, benevolent and beneficent. But we should not judge a religion by its practices. One era's spiritual error is another's heralded religion.

No one would deny that the ten commandments are "religious," but religious principles need not be etched in stone or handed down from Sinai. A free exercise claimant can carry its evidentiary burden without producing in court a burning bush. While I attempt no cosmic definition of religion, it is clear that God and the mundane combine in the religion of the church under examination today. This church had a God-derived cosmos.

### III.

Having set forth my disagreements with the plurality's propositions of law, I turn to an analysis of the record. I believe the plurality's conclusion is wrong even on its own terms. The facts do not support the view that these beliefs were merely "policy" within the plurality's distinction between "policy" and "religion." The plurality seizes upon various instances when school officials—lay persons insensitive to the overtones of their choice of language— spoke loosely of the anti-integration "policy." I believe a more balanced analysis of the record as a whole would indicate that the witnesses also repeatedly referred to the "religious" moorings of the beliefs.

Dr. Arthur E. Kreft, the school's principal, testified at his deposition that enrolling blacks in the Dade Christian school would endanger the practice of his religion. (R. 198). He said the enrollment of blacks would alienate him from God "in the sense that I would be disobedient, according to my beliefs in the Scriptures." (R. 220). Enrollment of blacks would erode Kreft's "religious liberties." (R. 219). Appellees stipulated that they had no basis to impeach these statements by Kreft (R. 378), and I can conclude only that Kreft's beliefs are sufficiently "religious" to invoke free exercise scrutiny. I believe it incontrovertible

---

6. The plurality attempts to deal with *Gillette* by arguing that *Gillette* concerned an individual's views while here we deal with an institution's views. But Dade Christian has standing to assert the rights of the individuals, just as the private schools in *Runyon v. McCrary*, 427 U.S. 160 n.13, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) had standing to assert the rights of individuals.

7. Note also the handling of the companion case, *Negre v. Larsen*, 401 U.S. 437, 91 S.Ct.

828, 28 L.Ed.2d 168 (1971). Negre, a devout Catholic, claimed religious objection to "unjust" wars. The Court made no effort to determine whether opposition to unjust wars ranked high among the tenets of Catholicism or, indeed, whether any other Catholics shared the view. The Court rejected the free exercise claim because it found overriding governmental interests.

that appellant has standing to assert the free exercise rights of its principal, Dr. Kreft. Moreover, Kreft himself was a defendant, and the district court enjoined Kreft from denying appellee students admission to Dade Christian. Kreft can certainly assert his own free exercise rights. Kreft's testimony conclusively demonstrates the necessity to address the free exercise claim on its merits.[8]

Similar testimony came from John M. Kalapp, Dade Christian's original vice president, who left the school early in 1973. Kalapp believes that enrollment of blacks at Dade Christian would endanger his "religious beliefs" "[i]f it culminated in an intermarriage situation between the races" (R. 241), which he apparently believes it would. Kalapp derives these views from his "overall concept and understanding of the teaching of the entire Scriptures." (R. 250–51). Appellees stipulated that they had no basis to impeach these statements. (R. 378).

Also in evidence is a recording of remarks that Dr. Janney made to the New Testament Baptist Church congregation. Dr. Janney is the church pastor and president of Dade Christian Schools, Inc. The tape makes undeniably clear that Dr. Janney entertains religious beliefs that integrating Dade Christian would be wrong. Although he delivered the remarks after this suit was filed and in contemplation of litigation, no one questions their sincerity. The remarks were the message of a pastor to his congregation. Dr. Janney's views, derived from detailed analysis of numerous Biblical passages, could hardly be characterized as anything other than "religious," even under the

plurality's stringent approach. Dade Christian has standing to assert the free exercise rights of its president and founding church's pastor, and Dr. Janney's views alone should therefore take this court to the merits of the free exercise defense.[9]

In addition, Dade Christian has standing to assert the free exercise rights of students, parents, teachers, and church members. Although none of these persons testified, the record is replete with statements indicating that many of them entertain religious beliefs opposing integration. This is shown in the many statements by Dade Christian witnesses concerning what "we" believe.

Dr. Kreft testified that, based on Biblical interpretation, "we" are teaching that there should be no interracial socialization. (R. 212). Kalapp testified that by allowing blacks to enroll at Dade Christian, "We in effect would be teaching our young people that we sanctioned the socialization and the end result of intermarriage, and as a result of that we would be teaching them by example things that were contrary to our religious beliefs." (R. 245). Kalapp continued that accepting blacks at the school would put "us" "in an unfavorable light as far as being obedient to what He [God] would have us do." (R. 251).[10] These unchallenged statements undeniably establish that the views are "religious."

Surely a practice which is based on Biblical interpretation (R. 212) and the contravention of which would constitute disobedience to God (R. 251) is a "religious" practice.[11] Indeed, I would have thought this

8. If only Kreft's religious practices were involved, the constitutional balance might be struck differently than if widespread views were involved. I do not, however, understand the plurality to believe that the individual interests of Kreft or others are insufficient to outweigh the opposing governmental interests in enforcing § 1981. Rather, the plurality refuses to place these individual views on the scales at all.

9. Again, Janney's individual views might conceivably provide less support for the free exercise defense than would more widespread views. But the individual views at least re-

quire the court to go beyond the stumbling block of defining "religion." *See* note 8 *supra.*

10. The use of the first person plural to explain these views was perhaps unfortunate; it is not completely clear to whom the pronouns "we" and "us" refer. I believe the statements express the views of the teachers, the church members, the parents, or perhaps some combination of these.

11. The plurality concludes otherwise, relying on Dade Christian's printed card listing nine items which "we believe." As the plurality notes, the card does not mention racial segre-

conclusion too clear to give rise to differences of opinion.[12] Had the church members read the Bible and sought to obey God in a more conventional fashion, their views would have passed unquestioned as "religious." Yet the only distinction between such clearly "religious" views and those now before the court would lie in their familiarity to the majority of our citizens and to the judges of this court. If such a distinction determined one's ability even to cross the threshold to have one's free exercise claims heard on their merits, first amendment jurisprudence would indeed be at a low ebb.

It should be clear by now that I believe Dade Christian is entitled to rely on the religious views of the various related persons irrespective of how Dade Christian as an institution came to embrace the practice of racial segregation. Whether Dade Christian adopted its rule in response to passing fancy or fundamental religious belief, the rights of church members and school students may be asserted as a defense to this § 1981 action.[13] The plurality disagrees, emphasizing the manner in which the no-blacks rule evolved.

Once again, I believe the plurality is wrong on the facts as well as the law. The Dade Christian leadership adopted the rule in response to religious tenets, not transient policy dictates. Knowing that it would one day face the issue, Dade Christian's board of directors undertook a discussion of "what would be the right thing scripturally to do." (R. 238). The directors reached a decision based on "the overall concept of the teachings of the Scriptures, and such things as

God's dealing with the nation of Israel, the Tower of Babel, [and] the confusion of tongues in the Book of Acts." (R. 239). The board of directors concluded that "it was God's will that the races were made separate for a purpose." (R. 239). Appellants stipulated that they had no basis to impeach these statements. (R. 378). The plurality characterizes that decision, based on "God's will" as divined from the Bible, as not sufficiently "religious" even to warrant threshold consideration of the free exercise defense. I cannot agree.

. IV.

There is of course more to analyzing a free exercise claim than determining whether the belief in question is "religious." We must decide whether sufficient governmental interests justify interfering with the claimant's religious practices. In his dissent, Judge Roney concludes that we should delay passing on this matter, remanding instead for the district court's initial consideration. I respectfully disagree.

First, although I agree with Judge Roney that this record is no marvel, I do not believe we should remand for the taking of further evidence. This was a private lawsuit seeking individual relief. The parties tried it as they saw fit. Both sides submitted all their evidence. Defendants had every incentive to develop fully the nature of their beliefs concerning segregation and the place of those beliefs in the practice of their religion. Plaintiffs had every reason to challenge those presentations. The issues have remained unchanged throughout

---

gation. The first belief listed, however, is that the Bible is the infallible word of God. If the "we believe" card is to be read with the exacting scrutiny we accord to legal documents, we should treat the segregative beliefs derived from the Bible as incorporated by reference.

**12.** If citations are necessary, we could begin with *Wisconsin v. Yoder*, 406 U.S. 205, 216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In characterizing the beliefs there as religious, the Court relied on their derivation from the Bible.

**13.** *See* section IA *supra*. In *Runyon v. McCrary*, 427 U.S. 160, 175 n.13, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) the court recognized the

standing of private schools to assert their patrons' rights. The ruling extended to the 395 schools that were members of an association that was a party defendant. Many of those schools undoubtedly adopted their racially exclusive policies for reasons having nothing to do with the constitutional rights that they sought to assert on behalf of their patrons. Some may have been motivated by the prospect of financial gain, others by racial bigotry, and others by mere convenience. Yet the Supreme Court, in a single footnoted sentence, granted them all standing to assert their patrons' rights.

this litigation. In such circumstances there is no justification for remanding this case to allow either party to attempt to buttress its case. However imperfectly, this case has been tried.

Second, the district court's failure to consider the issue does not call for a remand. This litigation has now been pending for nearly four years. As victors below, appellees were of course free to urge on this appeal every ground supporting their judgment, and the balancing issue is properly before us. Appellees are undoubtedly eager to bring this action to a close and to receive whatever damages are ultimately awarded; they can hardly be expected to complain of an early decision. Appellant, too, has written this court noting the community pressures it bears as a result of the pending litigation and clearly indicating its desire for an expeditious resolution of the matter. Whatever the value to this court of the district court's views, they are of far less significance than the parties' interest in a final decision. We certainly have a sufficient factual basis for resolving all issues; Judge Roney does not point to any specific factual questions that are left unanswered by this record and that are necessary to our decision. I am unable to agree to a remand.

## V.

I now turn to the difficult issues that I believe are unavoidable. The Supreme Court has adopted various formulations in its efforts to reconcile governmental interests with those of free exercise claimants. In *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) the Court said that a religious practice could be infringed only on the basis of a "compelling state interest."[14] In *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) the Court announced that free exercise claims could be overbalanced only by "those interests of the highest importance and those not otherwise served."

Whatever the precise standard, free exercise analysis requires a careful comparison of the interests on both sides of the issue.

Charting the interests of free exercise claimants requires dispassionate dedication to the principle that courts cannot question the veracity of sincerely held religious beliefs. I therefore proceed on the assumption that desegregating Dade Christian would force the principal and at least some of the teachers, students and parents to be disobedient to God. (R. 220, 251). Rejecting the free exercise claim would impinge upon the religious practice of maintaining racial separation in activities that constitute "socialization."

That religious practice was characterized by Mr. Kalapp as a "very minor" part of the religion. (R. 251). Departure from the practice, although constituting disobedience to God, would not endanger salvation. While these factors do not sap the free exercise defense of vitality, they make clear that overriding that defense will not endanger the church's survival.

Nor can appellant's claim garner appreciable support from the fundamental interests of parents and students in guiding the quality and nature of the education. Allowing blacks into Dade Christian will not affect the substance of the education; the school remains free to teach any doctrine it chooses, including the merit and religious requirement of racial segregation. Dade Christian's argument that admission of blacks would itself convey an undesirable message and thereby affect educational content carries little weight. Although the school leadership's voluntary enrollment of blacks might communicate such a message, desegregation in response to a federal court's implementation of the congressional mandate of § 1981 would not. Much as merchants were freed by the Civil Rights Act of 1964 from any fear that white customers would react adversely to the acceptance of black business, parents and school leaders are freed by § 1981 from any fear

14. The Court quoted the phrase from *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

that children will interpret acceptance of blacks as an indication of church approval of the practice. The parents' right to direct the upbringing and education of their children remains intact.

Dade Christian is also unable to elicit any support from right of association principles. Here, as in *Runyon v. McCrary*, 427 U.S. 160, 175–179, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (rejecting association defense to § 1981 action against private school), the school simply does not operate in a manner implicating associational interests. Dade Christian advertises for students in the yellow pages and concededly exercises no policy of exclusion other than its ban on blacks. (R. 372). Dade Christian therefore can claim no constitutionally cognizable interest in the sanctity of its school community. This case on its facts simply does not implicate the interests of a church in maintaining the intimacy of its activities.[15]

The sole basis of Dade Christian's claim is therefore the "very minor" religious practice of preserving racial segregation in activities that constitute "socialization." If such activities extended to eating in restaurants, shopping in stores, or watching the Miami Dolphins, I suppose no one would contend the religious scruples would justify segregation of the activities. The government's interest in enforcing its policy of racial equality in such areas is clearly sufficient to override any free exercise defense.[16]

Dade Christian does not, however, advance religious opposition to integration of these public activities. Rather, its grievance extends only to interracial "socialization," which it defines to include children's school attendance but to exclude the above activities with respect to which the challenge would undoubtedly fail. Dade Christian's criterion for distinguishing proscribed "socialization" from other types of interracial contact is apparently the likelihood that interracial marriage will be encouraged. (R. 180–81, 199, 218, 239, 241, 245, 247). Thus adherents of the New Testament Baptist Church do not seek to overturn the Civil Rights Act of 1964 or to separate themselves from our integrated society; they merely seek to avoid situations that might lead to interracial marriage.

In this respect it is important to note that no one purports to use § 1981 as a basis for imposing interracial marriages upon anyone. Dade Christian students, like everyone else, remain free to marry whom they choose. Dade Christian parents remain free to teach their children that interracial marriage violates religious commands. That some students may depart their parents' commands and that integrating the school might make it infinitesimally easier for them then to effectuate their disobedience are hardly prospects lending weight to Dade Christian's position. The Constitution has never guaranteed parents an opportunity simultaneously to exist in an urban environment and to exclude every possibility that children will hear and adopt ideas at odds with those of the parents.

I do not mean to suggest that the religious beliefs at issue extend only to interracial marriage. Dade Christian advances a sincere belief that integrated education violates divine command. But that belief occupies a minor position in its adherents' religion and is based largely on the prospect of interracial marriage, a prospect that no government proposes to require.

In sum, Dade Christian's interests, while not minimal, do not rise to the level that has characterized numerous free exercise claims. I find that the government's interests, in comparison, are compelling.

Most free exercise cases have involved governmental interests manifested in legislative judgments. *See, e. g., Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32

---

15. Thus, while I am sensitive to the concerns expressed by Judge Coleman in his dissent, I do not believe they affect the decision here.

16. In such cases the governmental interest in racial equality would be augmented by the interests of other customers who oppose segregation. The case at bar does not involve such interests; there is no evidence that any Dade Christian students or parents oppose segregation.

L.Ed.2d 15 (1972) (governmental interest in public education beyond eighth grade held insufficient); *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (governmental interest in war-time draft held sufficient); *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (governmental interest in assuring one day each week of peace and quiet held sufficient). While these are legitimate legislative goals exhibiting varying levels of importance, none respond to *constitutional* obligations. The government is not constitutionally obligated to require public education, to draft soldiers, or to maintain a day of rest.

Here, in contrast, the government's interests draw strength not only from the congressional judgment manifested in § 1981 but also from the Constitution itself. The thirteenth amendment proscribes slavery and involuntary servitude. In ensuring blacks an equal opportunity to enter contracts, § 1981 seeks to eradicate some of the badges and incidents of slavery. A more compelling governmental interest has perhaps never been enlisted in opposition to a free exercise claim.

Dade Christian, however, seeks to minimize this interest by assigning it a narrow role in this case. Dade Christian would characterize the government's interest as that in the admission of two blacks to the Dade Christian school, rather than as that in eradicating the badges of slavery through universal enforcement of § 1981. This issue of the appropriate scope of the governmental interest recurs in free exercise decisions and poses important and subtle difficulties.

I believe that among the most important factors in this respect are the institutional consequences of the alternative decisions. When a court can recognize a free exercise claim without inviting numerous additional claims, focusing on the particular consequences of the ruling in the case at bar is appropriate. But when recognizing the claim will predictably give rise to further claims, many of which will undoubtedly be fraudulent or exaggerated, the situation is different. In that event the court must either recognize many such claims (so that the relevant governmental interest extends beyond the individual claimants in the original action) or draw fine and searching distinctions among various free exercise claimants. The latter course would raise serious constitutional questions with respect to the proper functioning of courts in sensitive religion clause adjudication. Courts are of course competent to sort sincere from insincere religious contentions, but the process of doing so, and of striking different balances when confronted with sincere claims posing subtle variations in religious dogma, inevitably embroils courts undesirably in religious controversies. When numerous claims are likely, recognizing some while rejecting others unavoidably forces courts to pick and choose among religions and to draw subtle distinctions on the basis of criteria with which no governmental unit should *ever* become entangled. Although the establishment clause values contravened by such a course of adjudication could not justify refusing to consider a free exercise defense, *see Wisconsin v. Yoder*, 406 U.S. 205, 234 n. 22, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), courts ought not to invite the prospect unnecessarily.[17]

17. Indeed, no Supreme Court decision recognizing a free exercise defense has involved a claim likely to induce numerous, often fraudulent attempts by others to invoke the protection of the decision. *See Wisconsin v. Yoder, supra* (claim of exemption from mandatory education beyond eighth grade unlikely to spawn additional claims); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (claim of entitlement to unemployment compensation after firing for refusal to work on Saturday unlikely to induce significant number of fraudulent claims).

When confronted with claims other than those arising under the religion clauses, courts appropriately attribute much less significance to the likelihood of future litigation. Religion clause cases are different because of the constitutional values that extensive litigation contravenes. Thus, for example, my analysis is consistent with the short shrift that equal protection courts frequently accord to arguments based on administrative convenience or the prospect of burdensome litigation. *See, e. g., Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

The claim that Dade Christian advances is not one that we could recognize without inviting numerous additional claims. Opposition to integration does not die easily. Those who turned to white academies in response to public school integration will undoubtedly seek ways to avoid *Runyon v. McCrary's* mandate to integrate the private schools. We therefore cannot view Dade Christian's claim in isolation. We have three alternatives: recognizing Dade Christian's claim but rejecting a significant number of future claims, recognizing Dade Christian's claim and most others as well, and rejecting Dade Christian's claim.

The first alternative would commit us to a case-by-case effort to distinguish meritorious from meritless future claims. In that way we could minimize the impairment of § 1981's goals, but we would thrust ourselves into the troublesome course of adjudication that I have described as contrary to more fundamental religion clause values. I believe we should reject this opportunity to set ourselves up as a board of religious arbiters.

The remaining alternatives are to steel ourselves to recognize virtually all of the free exercise claims that a decision for Dade Christian would foster, or to reject Dade Christian's claim. We must choose either to recognize the free exercise defense in this and numerous cases, thus undermining to a large extent the vitality of § 1981 in this area, or to override the defense and enforce § 1981's constitutionally-based mandate.

The appropriate result is clear. The constitutional imperative to eliminate the badges of slavery has not dimmed in the 114 years since President Lincoln issued the Emancipation Proclamation. The compelling governmental interest in moving nearer that noble goal overrides appellant's interest in preserving a "very minor" religious practice. No less restrictive alternative is available; the government cannot afford appellees their right to be free of racial discrimination in contracting without infringing appellant's opposition to such contracts. Although free exercise claims deserve the most careful consideration and the greatest deference, they cannot always prevail. When the government interest is so strong and the impact upon the religion so slight, the religious practice must yield. I concur in the judgment of affirmance.

RONEY, Circuit Judge, with whom GEWIN, COLEMAN, AINSWORTH, CLARK and TJOFLAT, Circuit Judges, join, dissenting:

Because the belief of the New Testament Baptist Church in separation of the races is sufficiently religious to establish a First Amendment claim, I respectfully dissent.

### I.

Whether a belief is "religious" and thus deserving of some protection by the First Amendment does not depend on whether the belief is true or false. *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). Nor does it depend on whether the belief is reprehensible to the majority of society. Instead, as the very cases cited by the plurality demonstrate, the "religious" nature of a belief depends on (1) whether the belief is based on a theory "of man's nature or his place in the Universe," *Founding Church of Scientology v. United States,* 133 U.S.App.D.C. 229, 409 F.2d 1146, 1160, *cert. denied,* 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969), (2) which is not merely a personal preference but has an institutional quality about it, *Wisconsin v. Yoder,* 406 U.S. 205, 216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and (3) which is sincere. *Theriault v. Carlson,* 495 F.2d 390, 394 (5th Cir.), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *United States v. Kuch,* 288 F.Supp. 439, 443 (D.D.C.1968) (alternate holding); *see Ballard,* 322 U.S. at 81–82, 64 S.Ct. 882.

The belief of the New Testament Baptist Church in separation of the races meets all these requirements. First, the church bases its belief on a system of theology derived from the Bible. The church infers a duty to segregate from the story of the Tower of Babel, the confusion of tongues in the Gospel of Acts, and certain statements of St.

Paul. For church members, racial intermarriage is a sin, though not a mortal one.

The plurality seeks to discredit the theological basis of the belief in segregation by noting it was adopted by a congregational ballot. The 1963 vote to exclude blacks from membership, the plurality observes, does not reflect religious belief because it could be repealed. Following that logic, no church which has a congregational, or even representative, form of government could be said to have any beliefs protected by the First Amendment, because church members, either directly or through elected representatives, control the content of church creeds. Such a holding is untenable. It discriminates among religions in violation of the Establishment Clause, and ignores the doctrine that questions of church government are beyond the scope of judicial review. *See Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

Second, the belief is not a mere personal preference but has found institutional expression, both in church teachings and in the operation of the school. The congregation voted to exclude blacks. At least one sermon delivered by Dr. Janney, the church's founder, has articulated the Biblical theory of segregation. The school lost its federal tax exempt status because it refused to sign a statement of nondiscrimination. The school edits teaching materials to exclude pictures of "multi-ethnic" groups. The school promulgated the policy card given the plaintiff.

The plurality seeks, in effect, to discount this institutional expression. The failure of written church documents to refer to segregation is said to show segregation is not a tenet of the church. However, a religious practice does not have to be written to enjoy First Amendment protection. *State v. Yoder,* 49 Wis.2d 430, 182 N.W.2d 539, 541 (1971), *aff'd,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Furthermore, the failure of examined documents to mention segregation may simply mean that segregation was such a well accepted belief of the membership that the church leaders felt the

congregation did not need any rules to guide its conduct in that respect. The 1963 church vote was unanimous. Finally, limiting protection to written beliefs discriminates unfairly against sects which are small or new, and so have not developed the elaborate theology of more traditional religious groupings. The impact of such discrimination on the defendant church's ability to prove its case is clear. It was forced to rely solely on documents generated by its less than 4,000 members during the short 22-year history of the church. The trial court rejected writings by authors who were not church members, on the grounds that no one other than Dr. Janney was proved to have read them.

The third question to be considered is whether the belief in segregation is sincere. The trial court said in this regard "[t]here is no doubt that it is a sincerely held belief and the Court recognizes the sincerity . . . ." Though the trial judge and the plurality impeach that sincerity by noting the recent vintage of the church statements concerning segregation, the record does not show any attempt to

> [adopt] religious nomenclature and cynically [use] it as a shield to protect them when participating in antisocial conduct that otherwise stands condemned.

*Kuch,* 288 F.Supp. at 443. Furthermore, timing alone should not discredit the sincerity of a religious belief. While the founding, or even expansion, of a school to accommodate white students seeking to evade a court order increasing the degree of desegregation in the public schools may well call sincerity into question, this record shows no evidence of such conduct. Absent such a manipulative purpose, application of established doctrine to changing social or technological circumstances should be protected, because it lies at the heart of a living faith.

A direct nexus exists between the New Testament Baptist Church belief in separation of the races and the desire to segregate the church school. The school and church are intimately associated. Church leaders founded the school in reaction to the court

decisions removing prayer from the public schools. *See, e. g., Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The pastor is the president of the school. All teachers belong to the church. The church and the school use the same building. The only room the church does not use on Sunday is the principal's office. The policy of segregation in the school springs from a belief that the Bible commands separation of the races and school segregation is necessary to deter intermarriage. The connection directly parallels the interest of the Amish parents in *Yoder,* who kept their children out of public high schools to avoid "worldly influences" which would interfere with a child's integration into the Amish faith community. 406 U.S. at 218, 92 S.Ct. 1526. Consequently, the impact of § 1981 on free exercise cannot be dismissed as "indirect." *See Braunfeld v. Brown,* 366 U.S. 599, 606, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). The command of § 1981 is that commercially operated private schools must admit students without regard to race. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). That imperative directly impinges on the free exercise rights of the New Testament Baptist Church.

## II.

The conclusion that the congressional mandate of § 1981 affects the church's free exercise of religion, however, does not end the matter for the Court. The established law requires a balance of one interest against another in a head-to-head conflict. *Wisconsin v. Yoder, supra; McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972).

I decline to consider that balance in this dissent. The plurality opinion does not address it. The district court did not consider the question and made insufficient findings to aid our analysis. The constitutional base for the statute is well established. *Runyon,* 427 U.S. at 165–171, n. 8, 168, 96 S.Ct. 2586. The constitutional right to free exercise of religion is emphatic. The record is silent, however, on a number of questions important to the balancing of these conflicting constitutional claims.

The judgment of the district court should be reversed, and the case remanded for further proceedings to resolve all issues relevant to the federal interest in applying § 1981 to infringe the free exercise rights of this church.

COLEMAN, Circuit Judge, dissenting:

I join in the dissent filed by Judge Roney. I agree with the reasoning demonstrated in that opinion, but perhaps my views run more deeply than those there exhibited.

I do not understand that the church is operating this school as a commercial enterprise. It is a direct, intimate adjunct of church activities, conducted in the house of worship. From the earliest days, when governments were doing absolutely nothing about it, nearly all religious denominations have conducted schools, including colleges, as an integral part of their activities. If the church is to remain absolutely separate and apart from the state, then no court should have the power to compel any church to admit any student to any school operated for religious reasons.

This case may turn out to be the first step of a long, intrusive interference with the exercise of religion. I hope this does not prove to be so.