Raymond FIEDLER; Melissa and Charlotte Fiedler by their father and next friend, Raymond Fiedler, Appellants,

v.

**MARUMSCO CHRISTIAN SCHOOL, Marumsco Baptist Church and Aleck Lee Bledsoe, Appellees.**

No. 79–1556.

United States Court of Appeals, Fourth Circuit.

Argued June 2, 1980.

Decided Oct. 10, 1980.

Victor M. Glasberg, Alexandria, Va. (Leonard S. Rubenstein, Hirschkop & Grad,

P. C., Alexandria, Va., Steven W. Bricker, American Civil Liberties Union of Virginia, Richmond, Va., on brief), for appellants.

I. J. Crickenberger, Falls Church, Va., (Crickenberger & Moore, Falls Church, Va., on brief), for appellees.

Daniel M. Schember, Gaffney, Anspach, Schember, Klimaski & Marks, P. C., Washington, D. C., on brief, as amicus curiae General Board of Church and Society of The United Methodist Church.

Drew S. Days, III, Asst. Atty. Gen., Washington, D. C., Walter W. Barnett, Irving L. Gornstein, Dept. of Justice, on brief, as amicus curiae United States.

Before HAYNSWORTH, Chief Judge, PHILLIPS *, Senior Circuit Judge, and ERVIN, Circuit Judge.

ERVIN, Circuit Judge.

In this appeal, Raymond Fiedler and his daughters, Melissa (Lisa) and Charlotte, all of whom are members of the white race, challenge the district court's dismissal of their civil rights suit brought under 42 U.S.C. § 1981 [1] against Marumsco Christian School, Marumsco Baptist Church (hereafter collectively called Marumsco) and Aleck Lee Bledsoe, principal of the school and pastor of the church (hereafter, Bledsoe). Alleging in district court that Lisa and Charlotte were expelled from the school in violation of their right to contract free from racial discrimination, the Fiedlers sought declaratory and injunctive relief and monetary damages; they also requested a jury trial.

■ Upon commencement of the district court proceedings, counsel for Marumsco advised the court that Marumsco had filed petitions under the Bankruptcy Act earlier that morning,[2] and requested a stay of the instant proceedings pending the outcome of the bankruptcy action. Denying the motion to stay the proceedings in their entirety, the court instead bifurcated the issues of liability and damages, reserving proof of damages for later trial, by jury if one were requested.

After discharging the jury venire, the district court tried the issue of Marumsco's liability under § 1981, and dismissed the case on the merits, finding that Marumsco and Bledsoe had a valid defense to the § 1981 claim by virtue of the free exercise of religion clause in the Constitution [3] (hereafter called "free exercise defense").

The Fiedlers now assert error in the district court's discharge of the jury on the issue of liability and in its dismissal of their claim on its merits. Because we find that the Fiedlers waived their right to a jury trial on the issue of liability, we dismiss that portion of their appeal. Finding, however, that the district court committed reversible error in its dismissal of the Fiedlers' § 1981 claim, we accordingly reverse that portion of the judgment.

### I.

Situated in Woodbridge, Virginia, Marumsco Baptist Church is an independent, unincorporated association of persons who profess a fundamentalist Christian faith and belief in the Bible. It is open to all fundamentalist Christians without regard to formal denomination or race. Marumsco Christian School is a private school established by the church for inculcating and transmitting the religious beliefs of the members of the church. The school does,

---

* Honorable Harry Phillips, United States Senior Circuit Judge for the Sixth Circuit, sitting by designation.

1. 42 U.S.C. § 1981 provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens, ...."

2. At oral argument, counsel for Marumsco advised this court that the school is presently operating in spite of the bankruptcy filing. The claim for injunctive relief is therefore not mooted.

3. The First Amendment to the Constitution in part provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ...."
U.S.Const. Amend. I.

however, hold itself out to the general public as providing, within the limits of its maximum enrollment, educational and related services to students who meet its admission requirements, pay the requisite tuition and fees, and agree to abide by school regulations; neither membership in the Marumsco Baptist Church nor adherence to the Baptist faith is required.

Since it was founded in 1972, the school has admitted students without regard to race and has sought to encourage interracial harmony and friendship. Bledsoe, however, opposes interracial *romantic* relationships, claiming to base his opposition on religious beliefs derived from the Bible and upon the conviction that such relationships are problematic socially. He does not as a general rule oppose romantic relationships between the sexes. His feelings concerning interracial relationships, however, are evidently quite strong: he advised one of the teachers in the school that he thought the sex drive was stronger in black men than in white men; he also admonished his school children that in the event of a takeover of the United States by a group similar to the Khmer Rouge, interracial couples would probably be liquidated. Neither the enrollment contract of the school nor the constitution and bylaws of the church expressly prohibit or allude to interracial dating.

Fiedler enrolled Lisa, age fourteen, and Charlotte, age eleven, in the school for the 1978–1979 academic year. He testified at trial that he wanted to give them a Christian education and that it was unavailable in public school, and that he had no problem accepting the principles of faith, the Bible teaching policy and the disciplinary procedure set out in Marumsco's application. He also testified that he was unaware of a school policy against interracial dating.

During the course of the school year, Lisa reestablished a friendship with Rufus Bostic, a fourteen year–old black student whom she had known while attending public school. Although Lisa testified that Rufus was not her "boyfriend," it was stipulated that Bledsoe believed in good faith that a romantic relationship existed between the two students. Bledsoe warned Lisa not to continue her association with Rufus, advising her that "the church had a position against it," and that he "personally had a position against it as pastor and principal"; he also referred to the "problems" Moses and Abraham had. It was stipulated that Bledsoe ultimately warned Lisa that if she were caught speaking to Rufus again on school premises or at school functions, she would be expelled. It was also stipulated that because he later observed her talking to Rufus and a third student in the school hallway, he did expel her.

In a telephone conversation with Fiedler following Lisa's expulsion, Bledsoe agreed to readmit Lisa to school after a two day suspension if Fiedler accepted the condition that Lisa would not speak to or associate with Rufus upon her readmission. The following day, Bledsoe heard that Fiedler had earlier contacted the NAACP regarding Lisa's initial expulsion; he then had a church deacon advise Fiedler that if Fiedler had indeed contacted the NAACP, then Lisa's expulsion would remain in effect and Charlotte would also be expelled. Fiedler told the deacon that he had been prepared to drop the matter, but that in light of Bledsoe's ultimatum he had now decided to proceed with legal action; the deacon then advised Fiedler that the girls would be expelled.

Following the girls' expulsion, Rufus Bostic's parents withdrew him from the school and his family resigned its membership in the church. Bledsoe testified that after the expulsion church attendance dropped from around two hundred forty persons to seventy or seventy–five persons; membership in the church also dropped by nine families.

## II.

The district court found that, as a ministry of the church, the school bases its conduct and spiritual standards on the religious tenets, doctrines, beliefs and convictions of the fundamentalist Christianity of the church. It found that, based on their interpretation of the Bible, Marumsco and Bledsoe believe that, although salvation is of-

fered and the church must be open to all without regard to race, interracial marriage, interracial dating and interracial romantic relationships are forbidden. The court concluded that Lisa was expelled because she refused to end her romantic relationship with Rufus after she was warned by Bledsoe that interracial romantic expressions on school premises and at school functions must end.[4]

The district court's dismissal of the Fiedlers' § 1981 claim was predicated on its ruling that the church has a bona fide religious belief that the Bible forbids interracial romance, dating and marriage, and that actions based on that belief are insulated by the First Amendment from attack, absent a finding of compelling state interest.[5]

The Fiedlers' contentions on appeal, that the district court erred in denying them a jury trial on the issue of Marumsco's liability and in dismissing their § 1981 claim due to improper imputation of Bledsoe's religious beliefs to Marumsco, will be considered separately.[6]

### III.

The Fiedlers first contend that the district court erred in denying them a jury trial. Assuming without deciding that they were in the first instance entitled to a jury trial on the issue of liability, it is clear that the Fiedlers' conduct here constituted a waiver of that right. *See, e. g., Country (Social) Club of Savannah, Inc. v. Sutherland*, 411 F.2d 599 (5th Cir. 1969); *West v. Devitt*, 311 F.2d 787 (8th Cir. 1963); *Smith v. Cushman Motor Works, Inc.*, 178 F.2d 953 (8th Cir. 1950).

The following colloquy took place prior to trial:

THE COURT: ... I am going to excuse the jury. I did not know they were in there.

(Whereupon, the jury was brought into the courtroom for instructions from the Court.)

THE COURT: ... No one told me you were in there for the case that you were apparently called for and I have ruled it

4. The court also found, somewhat contradictorily, that the expulsions took place "[w]hen the Pastor learned that Mr. Fiedler had apparently changed his mind and was not going to send Melissa back to school on the conditions agreed upon." This is clearly erroneous as the record reflects Fiedler had every intention of abiding by the agreement.

And, as still a third alternative reason for the expulsion, the district court ruled that

Plaintiffs [the Fiedlers] made representations to defendants [Marumsco and Bledsoe] of their pursuit of action not in accord with the conditions of the suspension and the underlying enrollment contract and were in breach thereof, whereupon defendants dismissed the aforementioned children of plaintiff Raymond Fiedler from Marumsco Baptist Church's school.

Although it is impossible to surmise from the opinion or record exactly what this vague holding refers to, the suggestion that the Fiedlers breached any contractual obligation to Marumsco is completely lacking foundation in the record.

5. Although the district court did not set forth in its opinion a clear reason for finding no such interest here, it implied that, in a case involving a private sectarian school, the state could never have an interest compelling enough to justify interference with the school's actions based on religious beliefs. In apparent support of this

theory, the district court paraphrased Judge Coleman's dissenting opinion in *Brown v. Dade County Christian Schools, Inc.*, 556 F.2d 310 (5th Cir. 1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978):

I do not understand that the Marumsco Baptist Church is operating the Marumsco Christian school as a commercial enterprise. It is a direct, intimate adjunct of church activities, conducted in the house of worship. From the earliest days, when governments were doing absolutely nothing about it, nearly all religious denominations have conducted schools, including colleges, as an integral part of their activities. If the church is to remain absolutely separate and apart from the state, then no court should have the power to compel any church to readmit any student who had been expelled from its church school for religious reasons. This case may turn out to be the first step to a long, intrusive interference with the exercise of religion. I hope this does not prove to be so.

6. The district court rejected what it perceived to be a suggestion by the Fiedlers that the religious belief in question is not a sincere one. The Fiedlers do not in fact ever challenge the sincerity of the alleged belief, only imputation of Bledsoe's belief (sincere though it might be) to Marumsco.

is not a jury matter. It is an equitable matter involving first of all, a constitutional claim. The facts have been stipu-. lated too [sic], and whether or not it is a constitutional issue, is for the Court to determine. At some date later, there might be a damage issue. If it is conceivably a jury matter, it is between a church and school which have declared and filed a petition for bankruptcy which would stay a damage claim pending the outcome of that. So we have no need for you . . .

(Whereupon, the jury was dismissed.)

MR. GLASBERG: We are prepared to go forward with the remaining factual contentions.

(Transcript at 18–19.)

The tenor of the entire pretrial conference with respect to the effect of the pending bankruptcy petition indicates that the Fiedlers wanted to proceed with the scheduled trial on the merits and were willing to do so before the court and without benefit of a jury.

Because of their acquiescence in the discharge of the jury, the Fiedlers have waived their right to assert on appeal that they were denied a jury trial.

### IV.

It is because we agree with the Fiedlers' contention that the district court erred in dismissing its § 1981 claim on the merits that we reverse with instructions to enter judgment in favor of the Fiedlers on the question of Marumsco's liability. We do so because we find that § 1981 does apply, and, as applied here, is not unconstitutional: the district court was clearly erroneous in finding that Marumsco holds a bona fide religious belief concerning the prohibition

of interracial relationships and that its practices based on that belief are therefore insulated by the Free Exercise Clause of the Constitution.

### A. Applicability of § 1981

 The first issue we are called upon to address is whether § 1981 prohibits a commercially operated, private, sectarian school from discriminating on the basis of race, specifically, by terminating a contractual relationship with a white student at the school because of her association with a black student at the same school.[7]

 As a preliminary matter, we point out that the Fiedlers, though white, have standing to sue under § 1981, albeit prior to the Supreme Court's decision in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), that question had been met with different responses by lower federal courts. *See* 427 U.S. at 286 n.16, 96 S.Ct. at 2581 n.16 and cases cited therein. In *McDonald*, in which white employees dismissed for allegedly misappropriating property from their employer sued under Title VII and § 1981 because a black employee similarly charged was not dismissed, the Court settled the issue. It rejected the employer's contentions that the language "as is enjoyed by white citizens" and the legislative history of § 1981 clearly limited the statute to the protection of nonwhites against racial discrimination. Section 1981 explicitly applies to "all persons," including white persons, said the Court, and "[w]hile a mechanical reading of the phrase 'as is enjoyed by white citizens' would seem to lend support to respondents' reading of the statute,

---

**7.** We recognize that, because of the sequence of events with respect to Lisa's initial expulsion, the conversion of that expulsion into a suspension and the final expulsion subsequent to the contact with the NAACP, the issue is not so clear–cut in this case as it could be. We find, however, that it is immaterial to the outcome of this case whether the contractual termination took place because of Lisa's association with Rufus or because of the Fiedlers' attempts to vindicate their constitutional and statutory rights: § 1981 affords a remedy for

both the initial expulsion and the retaliatory expulsions. *See DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306 (2nd Cir. 1975), modified on other grounds, 520 F.2d 409 (2nd Cir. 1975) (§ 1981 is the proper vehicle for a claim involving retaliatory practices against a white man who sold his home to a black); *see also Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (retaliation against a person who advocates the rights of another to hold property without respect to race violates § 1982).

we have previously described this phrase simply as emphasizing 'the racial character of the rights being protected.' " 427 U.S. at 287, 96 S.Ct. at 2582 (citation omitted).

The substance of the Fiedlers' claim is also properly treated within the scope of § 1981: *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), recognized that the statute was applicable to contracts for educational services as well as to those for employment. And it is settled that the nature of the discrimination in this case–taking adverse action against a white person because of his association with blacks–falls under § 1981. *See DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306 (2nd Cir. 1975), modified on other grounds, 520 F.2d 409 (2nd Cir. 1975) (suit allowed under § 1981 where a white employee claimed his company forced him into premature retirement solely because he sold his house, located in a neighborhood inhabited primarily by white company employees, to a black fellow employee); *Faraca v. Clements,* 506 F.2d 956 (5th Cir. 1975), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975) (claim that white teacher was denied a job because he was married to a black woman allowed under § 1981); and *see,* Developments in the Law–Section 1981, 15 Harv.C.R.–C.L.Rev. 29, 75–76 (1980); *see also Sullivan v. Little Hunting Park,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (upholding § 1982 suit by a white landowner who was expelled from a residential community park organization for having assigned his park interest to his black tenant); *Bills v. Hodges,* 628 F.2d 844 (4th Cir. 1980) (suit involving white apartment renters who sued under § 1982 after being evicted allegedly for biracial dating and entertainment practices); *Walker v. Pointer,* 304 F.Supp. 56 (N.D.Tex.1969) (claim stated under § 1982 where white tenants evicted for having entertained black guests).

Were it not for Marumsco's sectarian character (hence, its assertion of a free exercise right to discriminate on the basis of

race), this case would be virtually indistinguishable from *Runyon v. McCrary, supra. Runyon* held that a private, nonsectarian school that holds itself out to the public is open to suit under § 1981, and that the statute prohibited such a school from denying admission to prospective students on the basis of race. The Court pointed out that "[i]t is worth noting at the outset some of the questions that these cases do not present. ... *They do not even present the application of § 1981 to private sectarian schools that practice racial exclusion on religious grounds.*" 427 U.S. at 167, 96 S.Ct. at 2593 (emphasis in original) (footnote omitted). This language should be read only as an attempt to delineate what was at stake in that case and not as an implication that the statute is inapplicable to such claims. The district court, however, looked to this language and found that *Runyon* offered no help in determining whether § 1981 prohibits private sectarian schools from expelling students on religious grounds.[8]

■ It is clear, however, that *Runyon* offers the starting point for analyzing such a claim: the sectarian nature of the school is important only insofar as it may give rise to a constitutional defense to the claim. Merely because the school's defense is based on religious beliefs, as in this case, rather than on associational rights, as in *Runyon,* does not alter the applicability of § 1981 in the first instance; the constitutionality of the statute as applied is a separate question.

The Fifth Circuit has reached the same conclusion in *Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310 (5th Cir. 1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978), in which a sectarian school asserted a right based on religious grounds to practice racial discrimination in admissions. Although the *en banc* court was divided on the proper disposition of the case (the majority found the policy to be social or political rather than religious), all thirteen judges apparently agreed that *Run-*

---

**8.** The district court's refusal to recognize that private schools, *if commercially operated,* come within the scope of § 1981, is evident throughout its opinion. This was precisely the holding

in *Runyon,* however: that private schools, if actually open to the public, are not exempt from coverage. *See* 427 U.S. at 172 n.10, 96 S.Ct. at 2595 n.10.

*yon* settled the statutory issue. *See* 556 F.2d at 312, 315, 326.

## B. *Constitutionality of § 1981 as Applied*

Marumsco asserts, however, that § 1981 as applied to its actions in this case is unconstitutional because those actions were based on bona fide religious beliefs and hence are protected by the Free Exercise Clause. We disagree.

■ The threshold question in determining the validity of a free exercise defense is whether the belief called into question is in fact bona fide; if it is not, then the question whether the law as applied is unconstitutional need not be reached.

■ In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court established guidelines for determining whether a belief is a religious belief, the free exercise of which is protected by the First Amendment. *Yoder* involved a suit against Amish parents for failure to enroll their children in school after the eighth grade. The parents defended on grounds that the compulsory attendance law, which required them to send their children to either public or private school until age 16, violated their rights under the First and Fourteenth Amendments because such high school attendance was contrary to the Amish religion and way of life. The Court pointed out that "to have the protection of the Religion Clauses, the claims must be rooted in religious belief," for "[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations." 406 U.S. at 215, 92 S.Ct. at 1533. While recognizing that "a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question," the Court nevertheless found such a determination necessary when a free exercise defense is asserted because "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Id.* at 215–16, 92

S.Ct. at 1533 (footnote omitted); *see also Founding Church of Scientology v. U.S.*, 409 F.2d 1146, 1160 (D.C. Cir. 1969), *cert. denied*, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969) (footnote omitted) ("[t]hough litigation of the question whether a given group or set of beliefs is or is not religious is a delicate business, our legal system sometimes requires it so that secular enterprises may not unjustly enjoy the immunities granted to the sacred."). Hence, if the belief asserted is "philosophical and personal rather than religious," or is "merely a matter of personal preference," and not "one of deep religious conviction, shared by an organized group," it will not be entitled to First Amendment protection. 406 U.S. at 216, 92 S.Ct. at 1533. The *Yoder* Court found that, based on the abundant evidence in the record that the traditional way of life of the Amish was based on deep religious conviction, the Amish claim met the standards for entitlement to a free exercise defense.

In the recent case *Sequoyah v. TVA*, 620 F.2d 1159 (6th Cir. 1980), the Sixth Circuit applied *Yoder's* standards to defeat a claim by the Cherokee Indians that the completion and flooding of the Tellico Dam on the Little Tennessee River would cause them to "suffer injury by the infringement of their right to worship the religion of their choice in the manner of their choosing by the destruction of sites which they hold in reverence and in denial of access to such sites by [TVA]." 620 F.2d at 1160 (quoting Sequoyah's complaint). The district court accepted that the land to be flooded was sacred to the Cherokee religion but summarily dismissed the claim on grounds that the Indians had no property interest in the area. The court of appeals found the dismissal proper, but held that it should have been grounded on the failure of proof on the "quality of the claims" allegedly religious: the affidavits relied on did not show that the Valley was central or indispensable to Cherokee religious observances or that worship there was inseparable from their way of life; they demonstrated instead "personal preference" rather than convic-

tions "shared by an organized group," id. at 1164 (quoting *Yoder*, 406 U.S. at 216, 92 S.Ct. at 1533); and even the personal preferences appeared to be based on historical and cultural grounds rather than religious ones. Because the court concluded there was no constitutional infringement, it found no need to determine whether the government's interest was compelling in the face of the Cherokees' claim.

A plurality of the Fifth Circuit sitting *en banc* in *Brown v. Dade Christian Schools, Inc., supra*, was also able to avoid balancing "potentially conflicting interests" in that case. 556 F.2d at 312. In *Brown*, the district court held that § 1981 reached and forbade private discriminatory conduct of commercially operated sectarian schools and found that the facts of that case showed the discrimination was the result of a social policy or philosophy and was not the exercise of religion. The court of appeals, deciding that the appropriate focus was on the corporate or institutional belief rather than on individual members' beliefs,[9] agreed that the evidence supported a finding that the beliefs in question were not religious. First, none of the church's writings referred to segregation of schools and while the court did not hold "that a belief must be permanently recorded in written form to be religious in nature. ... the absence of references to school segregation in written literature stating the church's beliefs ... is strong evidence that school segregation is not the exercise of religion." 556 F.2d at 312. Second, the evidence that the belief, if contested, would be subject to change at the direction of the church membership

"comports with the social or political nature of the exclusionary policy." *Id.* (footnote omitted). Other evidence showed that the policy had never been officially adopted but had simply evolved gradually. The court of appeals affirmed the district court's holding that the school's policy was a social response to the growing issue of integration, though it did not deny that "a religious belief may be of recent vintage or formed instantaneously." *Id.* at 313. As a result of its affirmance of the district court's factfinding, the court did not feel compelled to balance the interests of § 1981 with those of the Free Exercise Clause.[10]

We believe that the *Brown* plurality adopted the appropriate analysis of the free exercise defense at issue in that case and in the instant one. The district court here, however, throughout trial and in its opinion, treated Bledsoe and Marumsco as one for purposes of determining the religious beliefs of the church: it assumed that which, under the *Brown* analysis, it should have been deciding, whether the views of Bledsoe were indeed the views of the church.[11] After focusing on the institution itself and after applying *Yoder* to determine the quality of its alleged beliefs, we find that the district court's imputation of Bledsoe's private views on racial purity to the church was clearly erroneous.

█ Examination of the record in this case establishes that the evidence is overwhelmingly against the district court's findings that Bledsoe's personal beliefs are the church's beliefs.[12] Evidence showed that the church's writings–the statement of cooperation signed by parents of the school's

---

9. The district court's test was "whether there was a generally held, recognized, fundamental religious tenet of the school through its leadership." *See* 556 F.2d at 316 (concurring opinion).

10. Judge Goldberg, in a special concurrence, felt that consideration of the free exercise claim on its merits was unavoidable; his resolution was against the free exercise defense in the face of the compelling government interest in securing the rights of blacks to contract with private schools. He also disagreed with the plurality's focus on the institutional belief, thinking that the proper guide is the beliefs of

the "*people* behind the institutions." 556 F.2d at 316 (concurring opinion) (emphasis in original).

11. The court's comment that "I cannot conceive if the preacher does not espouse the cause of his church, then who does" (Transcript at 234) is indicative of its approach to the issue.

12. Even the pertinent beliefs of individuals within the church, including Bledsoe to some extent, appear to be based on social and political rather than religious grounds.

students, the constitution and bylaws of Marumsco Baptist Church, the statement of faith–do not address the subject of interracial romantic relationships, nor do they mention race relations at all. These, along with the Bible, constitute the written teachings of the church; according to testimony, the religious beliefs of the church were embodied in these writings.[13]

Evidence further showed that Fiedler, Lisa, Deacon Bostic and Gail Bostic were unaware until this incident of any church or school policy at all concerning interracial dating. Unanimous testimony in fact showed that prior to the expulsion there was never any corporate consideration at all of an alleged doctrinal opposition to interracial romantic relationships.[14] Admission to the school and membership in the church were available without regard to race; interracial friendships were encouraged. There was an interracial marriage in the Bostic family and no evidence showed that the church had ever stigmatized the Bostics as a result. Mr. Bostic, a deacon of four years' standing, testified that he had believed himself to be acquainted with the religious beliefs of the church and that he had understood the church's belief to be "that there should not be any segregation among Christian people for the Bible says there is no difference among blacks, whites, yellows, or greens." (Transcript at 51). He also testified that to his recollection Bledsoe

had never preached against interracial romantic relationships. Gail Bostic, a former teacher at the school, testified that she had heard Bledsoe express his personal views on the matter but that she was unaware of any church position on it based on religious grounds.

Bledsoe himself testified that his position was the position of the church and was based on the Bible; that he had preached about it from the pulpit though he could not remember how many times; that he had had no negative feedback from the sermons he had preached. He said that he believed "socially [interracial romantic relationships] would be a real problem," and when asked whether he distinguished the social problems and religious beliefs based on the Bible, he responded, "I tie the two together on a religious basis as being wrong and the various repercussions in society." (Transcript at 77–78).

The record in this case shows that Marumsco failed to prove its free exercise defense. Nothing other than Bledsoe's own conclusions indicates that his conviction regarding interracial romantic relationships is shared by the institution or that it is, in any event, more than a "personal preference." The institutional belief indeed is apparently one of racial equality and Bledsoe's belief is in no way reflective of that stance. The district court's contrary finding, offered without benefit of factual analysis, is not

---

**13.** Bledsoe furnished numerous Biblical references he claimed supported his opposition to interracial romantic relationships. Because the bona fides of Bledsoe's beliefs is not per se in issue (we need investigate it only to determine whether it is reflective of the institutional belief), these references are important only insofar as the church has adopted his interpretation of them. There is no evidence in the record to suggest that the church has done so.

**14.** Fiedler testified as follows:

MR. GLASBERG: To your knowledge, was interracial friendship encouraged at the church?

MR. FIEDLER: Yes, it was.

MR. GLASBERG: Did you have any inkling that that might not be so or the case in the church or school personnel other than the incident giving rise to this lawsuit?

MR. FIEDLER: None.

(Transcript at 40).

Deacon Tolman said that "[s]ince this particular event, we [the deacons] have thought along the lines of incorporating it in the By–Laws." (Transcript at 137). He also said that he had suggested the church take an official stand on the question of interracial relationships, and the following testimony then ensued:

MR. GLASBERG: I take it an official church stand does not presently exist.

MR. TOLMAN: No, I would not say that.

MR. GLASBERG: Why would you have to take it up if one exists?

MR. TOLMAN: It is not a question of taking a stand, but one of spelling out an existing stand on paper, so others can read it.

MR. GLASBERG: There is a present stand?

MR. TOLMAN: Yes.

MR. GLASBERG: And it is based on what?

MR. TOLMAN: This suit, for one thing.

(Transcript at 143).

supportable by any interpretation of the evidence offered at trial.

As no valid religious belief has been called into question and as Marumsco asserts no other constitutional defense, we need not balance interests to determine whether § 1981 as applied in this case is unconstitutional.

### IV.

The judgment of the district court is hereby reversed. We remand with instructions to enter judgment in favor of the Fiedlers on the issue of Marumsco's and Bledsoe's liability.

REVERSED AND REMANDED.