In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1102

RONALD D. SMART, doing business as PASCHALL ELECTRIC,

*Plaintiff-Appellant,*

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL 702,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99 C 956—**David R. Herndon**, *Judge.*

ARGUED JUNE 7, 2002—DECIDED NOVEMBER 15, 2002

Before BAUER, POSNER, and RIPPLE, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff in this racial discrimi-
nation case appeals from the grant of summary judgment
to the defendant, a local of the electrical workers union.
Two plaintiffs are listed, but one is a sole proprietorship
and the other the proprietor, so they are one, not two, in
the eyes of the law (with an irrelevant exception for the
case in which an individual is charged under RICO with
using for nefarious ends an enterprise consisting of a sole
proprietorship, *McCullough v. Suter*, 757 F.2d 142, 143-44

(7th Cir. 1985)), and the one is the proprietor, Ronald Smart, not the proprietorship. *Troelstrup v. Index Futures Group, Inc.*, 130 F.3d 1274, 1277 (7th Cir. 1997); *Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997); *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 293 (5th Cir. 1999) (en banc).

Smart, an electrical contractor who is white, hired Robert Thompson, who is black, to work for him as an electrician; Thompson was and is Smart's only employee. Smart had not signed on to the collective bargaining agreement that the IBEW local had signed with the area's other electrical contractors. Deciding to do so, he went to the union office and signed a letter of assent to the agreement. With him on this visit he took Thompson so that the latter could join the union. At the office Smart learned that the union had a program for subsidizing union contractors to enable them to compete more effectively with nonunion contractors, and he requested the application form. That was in July 1998. By October, the union had neither furnished the form nor arranged to swear in Thompson as a member of the union. Smart complained to the union and Thompson was sworn in; but still the form did not arrive. Between October 1998 and March 1999, Smart called the union officer with whom he had been dealing, Jim Nolen, 16 times requesting the form and also requesting that Thompson be enrolled in a union training program. He never got through to Nolen and the messages he left were never returned. Meanwhile in January 1999 Smart's union dues had been tripled, and two months later Smart wrote Nolen that he was terminating his relation with the union. Nolen promptly called him and asked him why. Smart explained that it was because of the delay in Thompson's swearing in and enrollment in the training program, the failure to send Smart the application form for the subsidy, and the tripling of his dues. Nolen said that Smart's dues had been raised because he was "working

with the tools"—the union charges higher dues to a union contractor who is not merely engaged in management and supervision but is actually working as an electrician. As for the enrollment of Thompson in the training program, Nolen said that if Smart wanted the "little bastard in school, he [Nolen] would get him there."

Smart was not satisfied, and so his termination as a union contractor stood. The union, however, filed a grievance against him pursuant to the collective bargaining agreement because he had failed to make required contributions to the union's welfare ("fringe benefits") fund. The grievance was arbitrated, and the arbitrators found Smart "guilty of non-payment of fringes as required. Further, the parties are encouraged to meet as soon as possible to resolve the current delinquencies." But the arbitrators did not specify the dollar amount that he owed the union.

Smart's suit challenges the arbitrators' award as invalid primarily because of lack of finality, and also claims that the union discriminated against him, because of his employing a black person, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Smart lays great stress on the fact that Thompson is also his son-in-law; the implication is that the union's real objection to Smart is not that he has a black employee, because the union has other black members, but that his daughter married one. There is, however, no evidence of this.

Insofar as the suit challenges the arbitrators' award, it is founded both on section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, which creates a federal judicial remedy for breach of a collective bargaining agreement, pursuant to which the award was issued, and the Federal Arbitration Act (Title 9 of the United States Code), which creates federal judicial remedies for disputes arising from certain agreements to arbitrate, including collective bargaining

and other employment agreements, with an irrelevant exception for employment agreements involving transportation workers. 9 U.S.C. § 1; see *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 358 (7th Cir. 1997). Section 301 is of course more than a jurisdictional and procedural statute; the Supreme Court has held that it is a directive to the courts to create a federal common law of collective bargaining contracts. The Federal Arbitration Act has no particular reference to such contracts and so if there were a conflict between the two statutes we would resolve it in favor of section 301. See *Coca-Cola Bottling Co. of New York, Inc. v. Soft Drink & Brewery Workers Union Local 812*, 242 F.3d 52, 54-55 (2d Cir. 2001). Where there is no conflict, however, and the FAA provides a procedure or remedy not found in section 301 but does not step on section 301's toes, then, as in *Pryner*, we apply the Federal Arbitration Act. We doubt that there was such a conflict in the *Coca-Cola* case either, though the court there thought there was; but that doubt doesn't have to be resolved in this case.

The Act requires the court to vacate an arbitrator's award, so far as bears on this case, "where the arbitrators . . . so imperfectly executed [their powers] that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Smart seems to think that this means that an arbitration award must be vacated if the award, were it a district court's judgment, would be unappealable under 28 U.S.C. § 1291 because it was not a final judgment. That is incorrect. It is apparent from the wording of section 10(a)(4) that it is not a jurisdictional provision. Rather, it assumes that the award is properly before the court, and establishes a ground for vacating it. The purpose of the section is merely to render unenforceable an arbitration award that is

either incomplete in the sense that the arbitrators did not complete their assignment (though they thought they had) or so badly drafted that the party against whom the award runs doesn't know how to comply with it. *IDS Life Ins. Co. v. Royal Alliance Associates, Inc.*, 266 F.3d 645, 650 (7th Cir. 2001); *ConnTech Development Co. v. University of Connecticut Education Properties, Inc.*, 102 F.3d 677, 686 (2d Cir. 1996); *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980).

There can be a jurisdictional question in cases challenging or seeking enforcement of arbitration awards, for although no statute corresponding to section 1291 tells the courts when an arbitration award is ripe for judicial enforcement or review, the courts are naturally reluctant to invite a judicial proceeding every time the arbitrator sneezes. But beyond that, generalization is difficult. In *IDS Life Ins. Co. v. Royal Alliance Associates, Inc., supra*, 266 F.3d at 650, we expressed skepticism about the propriety of engrafting Fed. R. Civ. P. 54(b) onto the arbitration statute and might have been understood to be implying a jurisdictional standard similar to that of section 1291. That seems to be the position of the Second Circuit as well. See *Michaels v. Mariforum Shipping, S.A., supra*, 624 F.2d at 413-14. But an earlier panel of our court had said that "a ruling on a discrete, time-sensitive issue may be final and ripe for confirmation even though other claims remain to be addressed by arbitrators," and this sounds Rule 54(b)-ish. *Publicis Communication v. True North Communications, Inc.*, 206 F.3d 725, 729 (7th Cir. 2000). The First Circuit is even more hospitable to what amount to interlocutory appeals of arbitral awards—to the extent of allowing review of the arbitrator's liability determination before he has made an award of damages, see *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16, 19-20 (1st Cir. 2001); *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 233-35 (1st Cir.

2001), which Rule 54(b) does not permit, *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 742-44 (1976); *Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir. 1994); *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 311 n. 3 (3d Cir. 2001), though later we shall note a minor exception to the rule that a judgment in a case seeking damages is not final and appealable under section 1291 until the amount of the damages has been computed and incorporated into the judgment.

One thing is clear, however: if the arbitrator himself thinks he's through with the case, then his award is final and appealable, *Local 36, Sheet Metal Workers Int'l Association, AFL-CIO v. Pevely Sheet Metal Co.*, 951 F.2d 947, 949 (8th Cir. 1992), for that is the rule under section 1291 as well, *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 387-88 (1978) (per curiam); *Miller v. Artistic Cleaners*, 153 F.3d 781, 783-84 (7th Cir. 1998); *Student Loan Marketing Ass'n v. Lipman*, 45 F.3d 173, 177 (7th Cir. 1995); and then section 10(a)(4) comes into play to guide the court in deciding whether the award is either incomplete (the arbitrator was wrong to think he was through with the case) or indefinite. Neither circumstance is present here. The question put to the arbitrators was whether Smart owed the "fringes," not how much he owed. The parties assumed that once that issue was resolved, if it was resolved against Smart, they could figure out readily enough how much he owed. And there is no ambiguity about what the arbitrators decided: they decided that Smart owed the fringes and they directed the parties to compute the amount owed.

This case illustrates why section 10(a)(4) should *not* be interpreted to incorporate the final-judgment rule of 28 U.S.C. § 1291. The idea behind arbitration is that it is good to allow parties to contracts to design the method of dispute resolution that is best for them. Since they bear the full

expense—arbitration is not subsidized by the taxpayer, as litigation is—they naturally want to economize on the cost of the procedure and so they may decide to confine the arbitrator to deciding liability, on the theory that once that decision is made it will be easy enough to determine the proper relief themselves, especially when the amount of money in issue is likely to be modest. There are analogies in litigation: declaratory judgments, and the principle that a judgment in a money case can be final if the computation of the money owed the plaintiff is mechanical ("ministerial," as the cases say), so that no further adjudicative process is necessary to determine what the amount owed is. E.g., *Mercer v. Magnant, supra*, 40 F.3d at 896; *Production & Maintenance Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1401-02 (7th Cir. 1992). Indeed, if the final-judgment rule applied to arbitrators' awards, the award in this case might pass muster anyway, because the computation of the fringes owed by Smart may be mechanical. But even if it would not be, if it were clear that the arbitrators had finished their assignment and clear as well what their award required the award would be enforceable even if all it did was determine liability, leaving thorny remedial issues for future determination.

We move on to the discrimination issues. Section 1981 of Title 42, one of the post-Civil War antidiscrimination statutes, guarantees, so far as bears on this case, equal rights "to make and enforce contracts." Smart argues that if as he believes the union failed to give him the application form for the subsidy for union contractors because he employed a black person, it was impeding his ability to make contracts by denying him a subsidy that would have made it easier for him to compete with nonunion contractors, and it was doing so on racial grounds albeit he is white. *Fiedler v. Marumsco Christian School*, 631 F.2d

1144, 1149 and n. 7 (4th Cir. 1980); cf. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150-52 (1970). This is a tenuous argument. Smart has made no effort to show that the alleged discrimination, unlike the discriminatory union job-referral service involved in *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 945 F.2d 906, 914-15 (7th Cir. 1991), actually affected his business, specifically his ability to get new business ("make . . . contracts"). See also *London v. Coopers & Lybrand*, 644 F.2d 811, 818 (9th Cir. 1981). He points to no contract that he bid on and failed to obtain because of racial animus by the union. See *Morris v. Office Max, Inc.*, 89 F.3d 411, 414-15 (7th Cir. 1996); *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1195-97 (10th Cir. 2002). The absence of evidence is unsurprising, since it would not be the union but the prime contractor or other entity that had let the bid who would decide who the winning bidder was. Smart might have a better argument that the alleged discrimination in effect prevented him from enforcing his contract with the union itself, since he contends (as we're about to see) that had he not hired a black the union would not have enforced the provision—to which he became bound when he registered as a union contractor—in the union bylaws specifying the dues obligations of union contractors. But not having been made in the district court, the argument is forfeited in this court.

We are also skeptical that Smart, as an employer, can sue under Title VII, a statute that forbids employment discrimination. Although it forbids a union "to cause or attempt to cause an employer to discriminate against an individual," 42 U.S.C. § 2000e-2(c)(3), an apt description of the misconduct that he is alleging, the obvious import of the provision is that an employee may sue a union that caused his employer to discriminate against him. That is, *Thompson* could sue Local 702; but he is not the plaintiff in this case. In *Northwest Airlines, Inc. v. Transport Work-*

*ers Union of America*, 451 U.S. 77, 93-95 (1981), the Supreme Court held that an employer found to have violated Title VII cannot obtain contribution from a union that shared responsibility for the employer's discrimination. Title VII does not mention contribution and the Court was unwilling to create an implied remedy, since "it cannot possibly be said that employers are members of the class for whose especial benefit . . . Title VII was enacted." *Id.* at 92. The union fastens on this language. But Smart points out that the Court also said that the provisions of Title VII that forbid discrimination by unions, such as section 2000e-2(c)(3), "construed most favorably to petitioner, could at most provide a basis for implying a remedy for harm to an employer caused by union wrongdoing." *Id.* at 93. This is classic dictum, and if anything evinces skepticism about implying such a right ("construed *most favorably* to petitioner, could *at most* . . ."). Moreover, in the more than two decades since the *Northwest Airlines* decision, the Supreme Court has become ever more reluctant to imply private rights of action, see, e.g., *Alexander v. Sandoval*, 532 U.S. 275, 286-89, 293 (2001), although its change of heart was announced earlier, in *Cort v. Ash*, 422 U.S. 66, 77-78 (1975). See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 377 (1982). No cases support Smart's position, though, surprisingly, none rejects it—but perhaps only because no one else has thought it had sufficient merit to be worth advancing.

And whether or not Smart has any statutory basis for his discrimination suit, he hasn't enough evidence to withstand summary judgment. That he was mistreated by the union is not evidence of racial animus. The delay in providing him with the application form, in swearing in Thompson, and in enrolling Thompson in a training program need not have had anything to do with Thompson's race. "Little bastard" has no racial connotation and

the tripling of Smart's dues was done pursuant to the express terms of the union's bylaws, which bound him. He did present evidence that two union contractors who like himself "work with the tools" paid only the single, not the triple, dues, and asks us to infer from this that the union's invocation of the bylaws was merely a pretext. But there isn't even evidence that either of those contractors were white and employed only whites, and if they were black or had black employees Smart failed to get even to first base in opposing summary judgment.

Laying this problem to one side and assuming therefore that one or both of the other contractors were all white, we still find that Smart failed to make a showing of pretext. An absence of uniform treatment need not be evidence that someone is lying. Suppose a black driver is given a ticket for driving 10 miles over the speed limit. He sues, alleging that he was given a ticket because he is black. The police officer who ticketed him submits an affidavit which states that he ticketed him because he was driving 10 miles over the speed limit. The driver does not deny that he was speeding but argues pretext and in support produces affidavits from two white drivers that they also drove 10 miles over the speed limit on the same highway during the period when this police officer was on duty and they did not get ticketed. This would not be evidence of pretext, because as is well known most speeding is not even detected. One cannot be guilty of treating people unequally if one doesn't know they're not the same, as the Supreme Court made clear in *Oyler v. Boles*, 368 U.S. 448 (1962), in the related context of a charge of selective enforcement in violation of the equal protection clause. The claim was that the state was discriminating against certain three-time offenders, but the evidence was merely that "according to penitentiary records a high percentage of those subject to the law have not been pro-

ceeded against. There is no indication that these records of previous convictions, which may not have been compiled until after the three-time offenders had reached the penitentiary, were available to the prosecutors. Hence the allegations set out no more than a failure to prosecute others because of a lack of knowledge of their prior offenses." *Id.* at 456; see also *LaTrieste Restaurant v. Village of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999). This case is the same. There is no evidence that the union was aware that the two other contractors were "working with the tools," and in the absence of such evidence it is pure conjecture that the bylaws were enforced against Smart because he employs a black.

AFFIRMED.

RIPPLE, *Circuit Judge*, dissenting.  My colleagues lay too heavy a burden of production on Paschall Electric. Mr. Smart has established a prima facie case that the Union has violated 42 U.S.C. § 2000e-2(c)(3) by attempting to cause Mr. Smart to discriminate against his employee, Mr. Thompson. Mr. Smart, moreover, has rebutted the Union's explanation. He has come forward with evidence that his dues were raised in January 1999. He was initially told that his dues were raised because he was not working enough hours, but the Union later explained that in raising his dues it merely was applying the rate applicable "for contractors, like Mr. Smart, who worked with the tools in the field as electricians." App. 61, ¶ 18 (affidavit of James Nolen). In reply, Mr. Smart has pro-

duced specific evidence of one other contractor, Daniel
Wilke, who works with the tools in the field as an electri-
cian, is charged the lower dues rate and has no African-
American employees. Mr. Wilke, in fact, had no employ-
ees in January 1999, which is why we may assume that he
worked in the field as an electrician.[1]

The Union has not explained why it charged Mr. Wilke
the lower dues rate that it charged Mr. Smart before it
became evident that he had an African-American employ-
ee. It claims that it charges all owner-workers the higher
rate, but the only evidence of this is Mr. Nolen's state-
ment in his affidavit that it does so; it has not come for-
ward with evidence of any other owner-worker, like Mr.
Smart and Mr. Wilke, who is charged the higher rate.[2]
In fact, it has not come forward with evidence that it has
charged any other contractor the higher rate. Mr. Smart,
however, has come forward with evidence of two other
contractors who are charged the lower rate, Mr. Wilke and
Harold Fitts, though Mr. Smart has not shown that Mr.
Fitts works in the field.[3] Uneven application of union
rules, when coupled with the other instances of mistreat-

---

[1] The fact that Mr. Wilke had no employees does not distin-
guish his case from Mr. Smart's. The relevant traits for purposes
of determining whether Mr. Wilke is similarly situated are that
Mr. Wilke was an electrical contractor who worked in the field
as an electrician.

[2] The Union points to a dues schedule that it produced, but
the schedule does not distinguish between contractors who
do not work in the field and contractors who do; it distin-
guishes between "wireman" contractors and "residential"
contractors. App. 67.

[3] Mr. Smart only produced two photographs taken from a
distance of a person he claims to be Mr. Fitts standing in the
back of a pick-up truck.

ment, raise sufficient circumstantial evidence of discriminatory intent to make summary judgment inappropriate.

The court ought to conclude, therefore, that Mr. Smart has provided enough evidence to make out a prima facie case and that the Union has failed to carry its burden of demonstrating that, despite these differences, it applies the requirement of higher dues for owner-workers in an evenhanded manner.

Because I believe that Mr. Smart has produced facts that would survive summary judgment, I would be required, were I in the majority, to reach the question of whether Title VII provides an employer in this situation a cause of action. Because the court declines to answer this question definitively, I believe the prudent course is to refrain from stating a definitive view on the matter until the issue necessarily must be decided. I simply note that *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77 (1981), in reserving the question, certainly does not support the skepticism of my colleagues that Title VII provides such protection. I am also constrained to point out that, unlike the situation presented in *Northwest Airlines*, we are not faced with teasing an implied right of action out of a text that does not address the situation; rather the situation before us involves, as my colleagues acknowledge, whether we would be justified in denying coverage by going beyond the plain text of the statute that traditionally has been interpreted broadly. *Cf. Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972). Perhaps, before the issue again makes its way to an appellate court, new scholarship in the field will shed more light on the appropriate approach to this question.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*